# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

GREGORY L. VOWELL d/b/a RBK
MANUFACTURING, JC PUMP CO. LLC,
and J.D. COOK, INC.,

        *Plaintiffs*,

vs.

Case No. 09-1303-EFM

COFFEYVILLE RESOURCES REFINING
& MARKETING, LLC,

        *Defendant*.

## MEMORANDUM AND ORDER

Plaintiffs are seeking recovery for damages they allegedly incurred as a result of approximately 90,000 gallons of crude oil, diesel, and other pollutants being released from Defendant's refinery into the Verdigris River. This matter is now before the Court on the following motions: Defendant's motion to sever the plaintiffs for trial (Doc. 35), Defendant's motion to strike affidavits submitted by Plaintiffs in support of their response to Defendant's summary judgment motion (Doc. 41), and Defendant's motion for partial summary judgment (Doc. 28). For the reasons stated below, the Court denies Defendant's motion to sever the plaintiffs for trial and to strike affidavits, but grants in part and denies in part Defendant's motion for partial summary judgment.[1]

---

[1] In a separate, but factually similar, case, *Eastman v. Coffeyville Res. Ref. & Mktg., LLC*, 10-1216-MLB, the presiding judge certified a number of questions to the Kansas Supreme Court that are relevant to the matter at hand. Neither party, though, has asked the Court to stay this case pending the resolution of those questions. As a result, the Court will forge ahead.

# I. BACKGROUND

Defendant operates an oil refinery in Coffeyville, Kansas, that is adjacent to the Verdigris River. On June 30, 2007, at 6:30 p.m., due to the tremendous amount of rain that the Verdigris River basin had received, and the fact that it was predicted that flood waters would come close to entering the refinery, Keith Osborn, the refinery's general manager, held a meeting with his employees to inquire about the refinery's activities. During the meeting, one of Defendant's employees, who had been tasked with the duty of measuring the elevation of the rising water, reported that in approximately four and a half hours the refinery's levee would be breached. At 7:50 p.m., Osborn made the decision to shut down the plant, a task that normally would take at least one day to accomplish. A few minutes later, the decision was made to pump an additional four feet of oil into Tank 8010, a forty-eight feet tall tank capable of holding 80,000 barrels of oil, because, at the time, it was filled only to the twenty-eight feet mark. According to Defendant, the purpose of adding the additional oil was to reduce the risk that the tank would float off its foundation if the refinery actually flooded. It was intended that the tank's inlet valve would be closed by the Oil Transfer System ("OTS") operator once the desired height was reached.

At 11:15 p.m., the flood waters breached the refinery's levee and started flowing into the plant.[2] A little over an hour later, the pumps to Tank 8010 were shut down because the oil was approaching the thirty-two feet mark. However, the inlet valve to the tank was not shut, thus enabling oil to continue to be gravity fed from the East Tank Farm, which is approximately three

---

[2]Plaintiffs contend that the water entered the plant in the afternoon of June 30. In support of this contention, Plaintiffs cite to photos taken by one of Defendant's employees that purportedly show a number of Defendant's oil tanks surrounded by water on the afternoon of June 30. As pointed out by Defendant, the problem with this evidence is that some of Defendant's oil tanks sit outside of the refinery's levee, and are thus outside of the plant. Without clarification as to whether the depicted oil tanks are ones inside of the refinery's levee, the Court cannot find that Plaintiffs have controverted Defendant's properly supported fact that flood waters did not enter the plant until 11:15 p.m.

miles away and is located on the other side of the river, to Tank 8010 at a rate greater than 1,500 barrels per hour. According to Bill Edens, the manager of the pipelines division, which is the division in charge of the East Tank Farm and is headquartered in Bartlesville, Oklahoma, a town forty-five miles away from the refinery, he had the capability of electronically closing the valve on the feeding tank in the Farm. However, he did not close the valve when he turned off the pumps because the normal practice was to control the inflow into Tank 8010 by opening or closing the valve at the refinery.

Sometime in the early morning hours of July 1, Gary Martin, a member of the OTS department, called into the plant to let Defendant know that the inlet valve to Tank 8010 may not have been closed.[3] At approximately 7:00 a.m., Steve Lafferty, an employee at the refinery, called Edens to inform him that Tank 8010's inlet valve had not been shut and to ask if he could electronically close the valve on the tank feeding Tank 8010.[4] Edens responded that he could not accommodate Lafferty's request because the East Tank Farm had lost power a few hours earlier. Edens and Lafferty discussed alternative ways that the feeding tank's valve could be closed. The idea of taking a boat to the East Tank Farm was brought up, but was rejected, as Lafferty thought the water was too swift and dangerous. The idea of having a Bartlesville employee drive to the Farm was also brought up. However, Edens rejected it after looking at the maps available to him and considering the weather reports.

---

[3]It is unclear from the record when the call was made. Defendant's statement of facts implies that the call was made sometime before 7:00 a.m. Plaintiffs allege, though, that the call was not made until, at the earliest, 7:30 a.m.

[4]The record is unclear as to whether Edens knew that the valve was not closed. At his deposition, when asked if someone had called to let him know that the inlet valve to Tank 8010 could not be shut, Edens responded yes. *See* Doc. 32-15, p. 23. A few seconds later, however, Edens stated that the phone call he received revealed that it was possible that the valve may have been missed. *See id.* Because this case is at the summary judgment stage, the Court will construe this testimony in the light most favorable to Plaintiffs, i.e., that Edens knew that the valve was not shut.

At approximately 8:00 a.m., Edens started calling around trying to find a helicopter able to take personnel to the East Tank Farm to close the valve. The first helicopter service he called did not get back to him until 8:45. Unfortunately, both of the service's helicopters were down for repairs. It was not until 9:15 that Edens was able to actually secure a helicopter. According to Edens, the helicopter was to land at the highest point in Coffeyville, the town's football stadium, sometime between 10:30 and 10:45 a.m. At 9:00 a.m., Edens asked two of his employees at the Bartlesville plant to drive up to Coffeyville, to ride in the helicopter with Keith Osborn, and to close the feeding tank's valve.[5] The helicopter did not arrive until 11:00 a.m.

As the helicopter flew over the refinery, Osborn saw oil coming down the side of Tank 8010. This is the point at which Osborn first learned that Tank 8010 was in fact releasing oil. Once the helicopter reached the East Tank Farm, the two employees that had joined Osborn closed the feeding tank's valve. Defendant estimates that the release began sometime between 10:15 and 10:30 a.m and stopped sometime between 11:15 and 11:30 a.m. During this time, nearly 80,000 gallons of oil were released from Tank 8010. Approximately 5,000 gallons of diesel oil were released from Tank 8050,[6] and 4,000 gallons of crude oil fractions were released from the refinery's sewer system.[7] The flood waters carried the oil-based substances downstream and into Oklahoma.

On July 3, Edens and another employee drove to the East Tank Farm from Bartlesville. To make this trip, Edens and the employee had to travel over 281 miles. Edens contends that it took one hour to plan the trip, and three hours to travel it.

---

[5] The East Tank Farm was not flooded.

[6] This release was due to this tank being moved off its foundation.

[7] This release was due to the system being flooded.

-4-

Since the flood, Defendant has paid over $50,000,000 to parties affected by the release. Defendant's oil still remains on Plaintiffs' property, though. During his deposition, Gary Martin stated that he had not heard of anyone getting in trouble over the July 1 release. On October 6, 2009, Plaintiffs filed the current action, asserting the following theories of recovery: (1) a violation of the Oil Pollution Act of 1990; (2) continuous nuisance; and (3) K.S.A. 65-6203.[8] They also are seeking punitive damages.

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[9] A dispute is genuine "if the evidence allows a reasonable jury to resolve the [dispute] either way."[10] A fact is "material" when "it is essential to the proper disposition of the claim."[11] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[12]

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact.[13] In attempting to meet this standard, the moving party need not disprove the

---

[8] The Court is cognizant of the fact that Plaintiffs did not explicitly mention K.S.A. 65-6203(a) in their complaint. However, they did include the theory in the pretrial order, which now controls. *See, e.g., Elephant Butte Irrigation Dist. of N.M. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1302 (10th Cir. 2008).

[9] Fed. R. Civ. P. 56(a).

[10] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[11] *Id.*

[12] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[13] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[14]

If the moving party carries its initial burden, the party opposing summary judgment cannot merely rest on the pleadings but must bring forth "specific facts showing a genuine [dispute] for trial."[15] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[16] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[17] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[18] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[19]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[20]

---

[14]*Id.* (citing *Celotex*, 477 U.S. at 325).

[15]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[16]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[17]*Adler*, 144 F.3d at 671.

[18]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[19]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[20]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## Analysis[21]

As noted above, the following motions are now before the Court: Defendant's motion to sever the plaintiffs for trial, Defendant's motion to strike affidavits submitted by Plaintiffs in support of their response to Defendant's summary judgment motion, and Defendant's motion for partial summary judgment. The Court will address these motions in turn.

**Motion to Strike**

In its motion, Defendant asks the Court to strike four of the affidavits Plaintiffs attached to their response to Defendant's summary judgment motion. After reviewing the evidence in the record, the Court concludes that these affidavits are not necessary to the resolution of Defendant's summary judgment motion, and, thus, will decide the motion without relying on them. As a result, the Court denies Defendant's motion to strike as moot.

**Motion to Sever**

Pursuant to Fed. R. Civ. P. 42, Defendant argues that this action should be bifurcated for trial for two reasons: first, the only issue remaining for trial is the nature and extent of each of the

---

[21]Throughout its briefing, Defendant cites to conclusions made by this Court in *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Insur. Corp.*, 08-1204-WEB, a case not involving the plaintiffs in this case, and claims that these conclusions have some type of preclusive effect in this litigation. *See, e.g.,* Doc. 29, p. 24 ("This Court (Judge Brown) has already made findings of fact and conclusions of law in companion litigation that require the inevitable conclusion that Coffeyville Resourses' conduct was not "wanton."). They do not. It is hornbook law in this jurisdiction, as it no doubt is in every other jurisdiction in the Union, that the doctrines of claim preclusion and issue preclusion apply only when the parties to the two actions are the same or in privity with each other. *See, e.g., Winston v. Kan. Dep't of Soc. & Rehab. Servs.*, 274 Kan. 396, 413, 49 P.3d 1274, 1285, *cert denied*, 537 U.S. 1088 (2002) (claim preclusion); *Williams v. Evans*, 220 Kan. 394, 396, 552 P.2d 876, 878 (1976) (issue preclusion). Here, it has not been shown that Plaintiffs are in privity with the first case's parties. Accordingly, the Court rejects Defendant's request to give preclusive effect to the conclusions made in *Liberty Surplus Insurance Corp.*

plaintiffs' alleged damages,[22] which, according to Defendant, vary dramatically,[23] and second, trying the individual claims together will prejudice Defendant, as the jury will likely become confused because of the multitude of issues they will be asked to decide and will likely believe that Defendant caused extensive damage to businesses and property in Coffeyville and did not take appropriate action. Defendant's arguments merit little response. Suffice it to say that the Court does not find them persuasive. Accordingly, the Court denies Defendant's motion to sever.[24]

**Motion for Summary Judgment**

Defendant raises two main arguments in its motion. The first is that summary judgment should be granted on Plaintiffs' nuisance theory. The second is that punitive damages are not a proper form of relief in this case. As shown below, the first argument is meritorious, but the second is not.

*Plaintiffs' Nuisance Theory*

Generally, to recover damages for the injuries he has sustained as a result of the defendant's conduct, a plaintiff must file his action within two years from the date the conduct causing such injuries occurred.[25] Here, Defendant accidently released the oil that injured Plaintiffs in July 2007;

---

[22] Defendant claims that this is so because it has already admitted liability for the oil release pursuant to K.S.A. 65-6203. *See* Doc. 36, p. 2 (citing Doc. 5, p. 2).

[23] One plaintiff is seeking damages primarily for injuries to his physical property, while the remaining plaintiffs are seeking damages mostly for lost revenue.

[24] *See, e.g., Belisle v. BNSF Ry. Co.*, 697 F. Supp. 2d 1233, 1250 (D. Kan. 2010). In their response, Plaintiffs propose, for purposes of trial, that the Court group the plaintiffs from this case and the ones in *Angleton v. Coffeyville Res. Ref. & Mktg.*, LLC, 08-1255-EFM, together based on where they reside. According to Plaintiffs' proposal, those plaintiffs that reside in Coffeyville should have their claims tried together, while those plaintiffs who live in Oklahoma should have their claims tried in a separate trial. Plaintiffs' proposal puts the proverbial cart in front of the horse. No motion to consolidate this case with *Angleton* has been filed. Accordingly, the Court will not address the hypothetical of what should be done if such a motion was granted.

[25] *See* K.S.A. 60-513(a)(4).

Plaintiffs did not file their action until October 6, 2009. As a consequence, Plaintiffs' nuisance claim is barred by the statute of limitation unless special circumstances exist that warrant a different result.

Plaintiffs contend that their nuisance claim is timely because the oil release constitutes a continuous nuisance, as the oil still remains on their property. If Plaintiffs' damages arose from a continuous nuisance, as opposed to a permanent nuisance, then Plaintiffs would not be limited to recovering damages for injuries that have resulted from a condition that was created over two years before he filed suit.[26] Implicit within Plaintiffs' contention is that the determination of whether a nuisance is continuing is based on the answer to the question of whether the injury caused by the defendant's conduct remains, not whether the defendant continues to engage in injury-causing conduct. Defendant disagrees with this premise, arguing that there can be no continuing nuisance unless there is continuing conduct. The Kansas Supreme Court has yet to pass on the precise issue of whether, in a case involving a continuing injury that immediately arose from a single instance of defendant's conduct, which instance occurred over two years before suit was brought, courts are to look at the underlying conduct or the lingering consequences of that conduct when deciding if a nuisance is continuing. However, guidance on how the Supreme Court would decide the matter can be found in that court's earlier decisions.

In *Simon v. Neises*[27], the Kansas Supreme Court declined to bar an action pursuant to the two year statute of limitations, even though construction of the levee which gave rise to plaintiff's damages had occurred more than two years in the past. The Court's opinion said that ". . . where

---

[26]*See, e.g., Simon v. Neises*, 193 Kan. 343, 348, 395 P.2d 308, 312 (1964).

[27]*Id.*

one creates a nuisance, and permits it to remain, so long as it remains it is treated as a continuing wrong, and giving rise, over and over again, to causes of action."[28] The continuous nuisance was clearly not the remaining injury to plaintiff's property, but the continuing wrong of permitting the levee to remain, when it was within the defendant's legal authority to remove the levee.

The Kansas Supreme Court applied the same principle, although to a different result, in *Bowen v. City of Kansas City*.[29] There, the plaintiffs, in 1976 and 1977, filed actions against the defendant, a dirt contractor who, in the 1960s, had moved dirt and rock for property owners downstream from the plaintiffs. Allegedly as a result of the dirt work plaintiffs suffered damages in 1976 from a flood, and filed a claim against the dirt contractor (among others).[30] Plaintiffs' theory of recovery was nuisance, which had a two year statute of limitation.

The Kansas Supreme Court affirmed the trial court's issuance of summary judgment in favor of the defendant. The court stated that because the defendant did not have the legal authority to reenter the offending property and abate the nuisance he had allegedly helped to create (the downstream obstruction), he could not be charged as a continuous wrongdoer. As a result, any nuisance action that the plaintiffs had against the defendant must have been brought within two years of when the first loss following the defendant's work occurred, which would have been a flood in 1969.[31]

---

[28]*Id.*

[29]231 Kan. 450, 646 P.2d 484 (1982).

[30]*Id.* at 452-53, 646 P.2d at 486.

[31]*Id.* at 454-55, 646 P.2d at 487-88.

Admittedly, *Simon* and *Bowen* are not on all fours with this case. Most notably, neither of the injuries that the plaintiffs sought recovery on in those cases immediately arose out of the defendant's conduct and continued up to and thru litigation. Nevertheless, despite the differences between those cases and this one, the Court finds their holdings instructive on how the Kansas Supreme Court would decide this case if it was before it. These cases demonstrate that it is not good enough for the plaintiff to merely point to the fact that he continues to suffer injuries as a result of the defendant's earlier conduct; rather, he must show that the injuries he is seeking to recover damages for arose from conduct occurring within two years of when he filed suit.[32] Therefore, following this line of authority, the Court concludes that, in a case such as this, to survive a motion for summary judgment on his continuous nuisance claim, a plaintiff must show, at a minimum, that at some point in the two years preceding the filing of his action the defendant engaged in injury-causing conduct.

Focusing on the defendant's conduct not only comports with the Kansas Supreme Court's precedent, but also advances the purpose behind statutes of limitation. "Statutes of limitations are intended to prevent unfair dilatory litigation against a defendant and to require that claims be litigated while proper investigation and preservation of evidence can occur."[33] " 'They represent

---

[32]To be sure, in certain cases, a plaintiff may be able to assert a continuing tort claim even though the last time that the defendant expressly acted was over two years before suit was filed. That is because the conduct in question can include an ongoing failure to take action which the defendant is legally authorized to take, where such action would have been necessary to abate the nuisance. For example, in a case where the defendant constructed a dam or levee on his property in 2005, the dam or levee caused damage to the plaintiff's property every time it rained, a fact the plaintiff was aware of, and the defendant did nothing to either aggravate or mitigate the problem after the dam or levee was built, the plaintiff may still bring a nuisance claim against the defendant in 2011 seeking damages for injuries he incurred in the previous two years. *See, e.g., Simon*, 193 Kan. at 348, 395 P.2d at 312. One rationale for allowing recovery in the above hypothetical is that the defendant should be required to compensate the victim for his decision to permit an abatable condition on his property to persist. Another, as noted by the late Judge Theis, is that awarding damages in such an instance "provide[s] incentive for one operating a nuisance to quit doing so in order to avoid successive damage suits." *Scheufler v. Gen. Host Corp.*, 1993 WL 58280, at *3 (D. Kan. Feb. 12, 1993).

[33]*Vigos v. Mountainland Builders, Inc.*, 993 P.2d 207, 213 (Utah 2000).

a public policy about the privilege to litigate.' "[34] The adoption of the Plaintiffs' test, i.e., a continuing injury test, would effectively thwart the express will of the state legislature, as it would allow a plaintiff to bring his claim many years after the period of limitations had expired.[35] Thus, by rejecting Plaintiffs' test and adopting the one it has, the Court upholds the state legislature's determination that two years from the date of the conduct causing the injury is the proper amount of time for a plaintiff to file his action.[36]

Lastly, support for the conclusion that the defendant's conduct should be the focus when analyzing a continuous nuisance claim can be found in the precedent emanating from other states' supreme courts, as a majority of those courts have also adopted a conduct-based test for determining whether the plaintiff has presented a viable continuing tort claim.[37]

Applying the afore stated test to the facts of this case, the Court concludes that no reasonable jury could find that a continuous nuisance exists. The record supports a finding that only one oil release injuring Plaintiffs has occurred. There has been absolutely no showing that there has been

---

[34]*Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 132, 631 P.2d 222, 236 (1981) (quoting *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945)).

[35]Of course, the state's statute of repose, K.S.A. 60-513(b), would still prevent an action from being brought over ten years after the act giving rise to the cause of action occurred.

[36]It is worth noting that the state's statutes of limitation do not start to run until the plaintiff's injury becomes reasonably ascertainable. *See* K.S.A. 60-513. Thus, the test adopted by the Court will not strip a plaintiff who learns of his injuries only years after the fact, which is often the case in pollution cases, of his cause of action. *See Fed. Deposit Ins. Corp. v. Laidlaw Transit, Inc.*, 21 P.3d 344, 356 (Alaska 2001) (recognizing that the discovery rule adequately addresses the problem associated with unknown injuries and statutes of limitation).

[37]*See Fed. Deposit Ins. Corp.*, 21 P.3d at 356 (basing its determination on whether the defendant's conduct is ongoing, not on whether the ill effects of earlier conduct still linger); *Hogg v. Chevron USA, Inc.*, 45 So.3d 991, 1005-06 (La. 2010) (same); *MacBride v. Pishvaian*, 937 A.2d 233, 240-41 (Md. 2007) (same); *Carpenter v. Texaco, Inc.*, 646 N.E.2d 398, 399-400 (Mass. 1995) (same); *Alston v. Hormel Foods Corp.*, 730 N.W.2d 376, 381(Neb. 2007) (same); *Sexton v. Mason*, 883 N.E.2d 1013, 1019 (Ohio 2008) (same); *Breiggar Props., L.C. v. H.E. Davis & Sons, Inc.*, 52 P.3d 1133, 1135-36 (Utah 2002) (same). *But see Hoery v. United States*, 64 P.3d 214, 222 (Colo. 2003) (finding the continued presence of contaminants on the plaintiff's property to constitute a continuing nuisance, despite the fact that the wrongful conduct, the releasing of the contaminants, had ceased).

another, much less an ongoing, release of oil-based substances onto Plaintiffs' property since July 2007. Thus, Plaintiffs have failed to raise a genuine dispute of material fact as to whether Defendant has engaged in injury-causing conduct in the two years preceding this suit. As a result, Defendant is entitled to summary judgment on Plaintiffs' continuous nuisance claim. Furthermore, Defendant is entitled to summary judgment on Plaintiffs' non-continuous nuisance claim, to the extent Plaintiffs assert one, because the present suit was not filed within two years of when the event giving rise to their cause of action occurred. Therefore, the Court grants Defendant's motion in so far as it seeks summary judgment on Plaintiffs' nuisance theory.[38]

### *Plaintiffs' Claim for Punitive Damages*

Defendant argues that it is entitled to summary judgment on Plaintiffs' claim for punitive damages for three reasons: first, there is no underlying cause of action that would support the issuance of punitive damages; second, its employees' conduct on June 30 and July 1 was not wanton; and third, it neither authorized nor ratified the conduct that caused the oil to be released during the flood. As explained more fully below, the Court rejects each of these arguments.

Under Kansas law, "[a] verdict for actual damages is a prerequisite to the award of punitive damages."[39] Thus, at the summary judgment stage, the plaintiff must assert at least one viable theory of recovery on which punitive damages can be based. Here, Plaintiffs have asserted three theories of recovery: (1) the Oil Pollution Act; (2) continuous nuisance; and (3) K.S.A. 65-6203. Plaintiffs concede that punitive damages cannot be based on a claim made under the Oil Pollution Act.[40]

---

[38]Because the Court finds that Plaintiffs' nuisance theory is untimely, it does not reach Defendant's argument that such a theory is substantively faulty.

[39]*Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 740, 822 P.2d 617, 624 (1991).

[40]*See* Doc. 32, p. 19 n.3.

Further, as shown above, nuisance is not a viable theory of recovery in this case. Therefore, the only possible ground for allowing Plaintiffs' punitive damages claim to continue is K.S.A. 65-6203, which provides, in relevant part:

> (a) It shall be the duty of any person responsible for an accidental release or discharge of materials detrimental to the quality of the waters or soil of the state to: (1) Compensate the owner of the property where the release or discharge occurred for actual damages incurred as the result of the release or discharge, or as the result of corrective action taken or access to take corrective action, if the release or discharge occurred without any contribution to the contamination and without any causal connection to the release or discharge by any action of the owner or owner-permitted occupant of the property; and (2) comply with all existing rules and regulations and requirements of the secretary of health and environment designed to ensure the prompt correction of any such release or discharge for the protection of the public health and environment.

The first question that must be answered is whether K.S.A. 65-6203(a)(1) creates a private cause of action. In cases where the applicable statute does not expressly state that it provides a private cause of action, which is the case here, the Court considers the "language of the statute," "the nature of the evil sought to be remedied and the purpose the statute was intended to accomplish" to determine whether such a result was intended by the legislature.[41] In the present case, Defendant does not contend that K.S.A. 65-6203(a)(1) does not create a private cause of action. After reviewing the statute's plain language, the Court concludes that the Kansas legislature intended to create a private cause of action by enacting K.S.A. 65-6203(a)(1). Therefore, the Court will move on to the next inquiry: what is the applicable statute of limitation?

---

[41] *Greenlee v. Bd. of Cnty. Comm'rs of Clay Cnty.*, 241 Kan. 802, 804, 740 P.2d 606, 608 (1987).

In its briefing, Defendant claims that the two year limitation set forth in K.S.A. 60-513 applies.[42] Plaintiffs respond that the three year limitation provided for in K.S.A. 60-512 governs.[43] In order for K.S.A. 60-512 to apply, the statute in question must "create[] a new, substantive right not recognized at common law . . . [it must not] merely afford[] relief for certain violations of existing common law rights."[44] Recent decisions by the Kansas Supreme Court show that a statutory cause of action that is similar to a common law one may nevertheless qualify for K.S.A. 60-512 so long as its elements are different than those of its common law counterpart.[45] In cases "where there is doubt as to which statute of limitation should apply, the longer statute should be chosen."[46] Additionally, when interpreting the statute supplying the cause of action, courts are to "presum[e] that the legislature does not intend to enact useless or meaningless legislation."[47]

In support of its argument that the two year statute of limitation applies, Defendant directs the Court's attention to *Kirtland v. Tri-State Insurance Co.*[48], a case holding that a statute permitting a plaintiff to bring suit directly against a motor carrier's insurer did not create a new cause of action,

---

[42]K.S.A. 60-513(a)(4) provides that "[a]n action for injury to the rights of another, not arising on contract, and not herein enumerated" shall be brought within two years.

[43]K.S.A. 60-512(2) provides that "[a]n action upon a liability created by a statute other than a penalty or forfeiture" shall be brought within three years.

[44]*McCormick v. City of Lawrence*, 278 Kan. 797, 798-99, 104 P.3d 991, 992 (2005).

[45]*See Burnett v. S.W. Bell Tel., L.P.*, 283 Kan. 134, 144-52, 151 P.3d 837, 844-48 (2007); *McCormick*, 278 Kan. at 806-07, 104 P.3d at 997.

[46]*Haag v. Dry Basement, Inc.*, 11 Kan. App. 2d 649, 652, 732 P.2d 392, 394, *rev. denied*, 241 Kan. 838 (1987) (internal quotation marks and citation omitted).

[47]*Burnett*, 283 Kan. at 145, 151 P.3d at 845 (alteration in original) (internal quotation marks and citation omitted).

[48]220 Kan. 631, 556 P.2d 199 (1976).

and *Farmers Insurance Co. v. Farm Bureau*[49], a case holding that a statute that provides for recoupment by the insurer of personal protection benefits paid to its insured from the tortfeasor and his insurer through subrogation did not create a new cause of action. In addition to the cases cited by Defendant, the Court has found only one other case where a Kansas appellate court found that the statute in question did not qualify for K.S.A. 60-512, *Gehring v. Kansas Department of Transportation*[50]. In that case, the statute at issue was the Kansas Tort Claims Act, which allows an individual to sue a governmental entity for damages caused by its employees.

After reviewing the above cases and others, the Court concludes that the three year statute of limitation should apply. First, *Kirtland*, *Farmers Insurance Co.*, and *Gehring* are distinguishable. In those cases, the statutes at issue did not give the plaintiff a cause of action for the defendant's violation of the statute's provisions; rather, they merely afforded the plaintiff another avenue he could pursue to recover relief to which he was entitled. Additionally, as noted in each of those cases by the presiding court, if it would have held differently, it would have either opened up the defendant to suit for a longer period of time than the original tortfeasor or provided the plaintiff, an insurer, greater rights, i.e., a longer statute of limitation, than the insured. Such anomalies will not be created if the Court applies K.S.A. 60-512 to K.S.A. 65-6203. Second, the requirements for making out a claim under K.S.A. 65-6203 do not appear to be exactly the same as those for similar common law actions.[51] Therefore, for these reasons, and in light of the Kansas appellate court's

---

[49]227 Kan. 533, 608 P.2d 923 (1980).

[50]20 Kan. App. 2d 246, 886 P.2d 370 (1994), *rev. denied*, 256 Kan. 994 (1995).

[51]To succeed on a trespass theory that is based on foreign matter intruding upon his property, a plaintiff must show an intent to intrude or knowledge that such an intrusion was substantially certain. *See, e.g., Muhl v. Bohi*, 37 Kan. App. 2d 225, 229, 152 P.3d 93, 98 (2007) (citing *United Proteins v. Farmland Indus.*, 259 Kan. 725, 729-30, 915 P.2d 80, 83-84 (1996)). Nuisance claims require the consideration of "many things, such as the type of neighborhood, the nature of the thing or wrong complained of, its proximity to those alleging injury or damage, its frequency, continuity

admonition to apply the longer statute of limitation in cases where it is not entirely clear which of two statutes applies, the Court finds that K.S.A. 65-6203 claims may be brought within three years of when the claim accrues.

With the foregoing in mind, the Court concludes that Defendant's motion for summary judgment, in so far as it seeks dismissal of Plaintiffs' punitive damages claim on the ground that there is not an underlying cause of action on which it can be based, should be denied. Plaintiffs have presented sufficient evidence to raise a factual dispute as to whether the substantive requirements

---

or duration, and the damage or annoyance resulting." *See, e.g, Sanifer Motors, Inc. v. City of Roeland Park*, 6 Kan. App. 2d 308, 312, 628 P.2d 239, 243 (1981). Negligence claims turn on the presence of unreasonable conduct. *See, e.g., Calwell v. Hassan*, 260 Kan. 769, 777, 925 P.2d 422, 428 (1996). Lastly, strict liability applies only if the defendant engages in abnormally dangerous activity. *See, e.g., Pullen v. West*, 278 Kan. 183, 189, 92 P.3d 584, 591 (2004).

The Court notes that it appears that up until 1987 K.S.A. 65-6203 would not have provided a plaintiff with any substantive right that the common law theory of strict liability did not already afford him, as Kansas followed the doctrine set forth in *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868), which states that any person who makes a non-natural use of his land is strictly liable for any damage that ensues, *see, e.g., Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P.2d 953, 957 (1934). However, in *Williams v. Amoco Prod. Co.*, 241 Kan. 102, 734 P.2d 1113 (1987), a case involving the escape of natural gas from the defendant's well, the Kansas Supreme Court amended the common law by adopting sections 519 and 520 of the RESTATEMENT (SECOND) OF TORTS, which hold that the determination of whether strict liability applies is a question of law that hinges upon a finding that the underlying activity is abnormally dangerous. *See Anderson v. Farmland Indus., Inc.*, 136 F. Supp. 2d 1192, 1197 (D. Kan. 2001) (acknowledging the change); *Greene v. Prod. Mfg. Corp.*, 842 F. Supp. 1321, 1326 (D. Kan. 1993) (same); Arthur E. Rhodes, *Damage to Real Property: The Lay of the Land*, 75 J. KAN. B. ASS'N 6, 24 n.29 (same). Since *Williams*, the Kansas Supreme Court has twice reaffirmed its adoption of the RESTATEMENT (SECOND) analysis. *See Pullen*, 278 Kan. at 189, 92 P.3d at 591 (declaring that a finding that the challenged activity is abnormally dangerous is necessary "before the doctrine of strict liability may be applied"); *Falls v. Scott*, 249 Kan. 54, 60, 815 P.2d 1104, 1110 (1991) ("The Restatement (Second) of Torts § 519 sets forth the general rule regarding strict liability in tort for abnormally dangerous activities[.]"). In deciding if an activity is abnormally dangerous, the following six factors are to be considered: (a) existence of a high degree of risk of some harm to the person, land, or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes. RESTATEMENT (SECOND) OF TORTS § 520. The Court is aware that the state's pattern instruction on strict liability, PIK Civ.4th 126.80, does not reflect this change. This fact does not mean, though, that the analysis set forth in sections 519 and 520 does not govern strict liability claims brought under Kansas law. *See, e.g., United States v. Ledford*, 154 F. App'x 692, 706 (10th Cir. 2005) (stating that proposed pattern instructions are not legal authority).

In contrast to the common law causes of action described above, to recover under K.S.A. 65-6203, a plaintiff need only show that the defendant allowed oil to be released and, due to this release, his property has been damaged.

of K.S.A. 65-6203 are met. Further, they have timely asserted this claim.[52] As a result, the Court rejects Defendant's first basis for seeking summary judgment, and moves on to the two remaining ones.

The Court makes short shrift of Defendant's second and third bases for seeking summary judgment. According to Defendant, Plaintiffs' claim also fails because they have failed to raise a genuine dispute of material fact as to whether its employees acted wantonly and whether it authorized or ratified the alleged wrongful conduct, which is necessary to avoid summary judgment on a punitive damages claim.[53] The Court disagrees. After viewing the record as a whole, and in a light must favorable to Plaintiffs, the Court cannot say, as a matter of law, that no reasonable jury could find that Defendant's employees acted wantonly and that Defendant ratified such conduct. Accordingly, summary judgment is not proper on Plaintiffs' punitive damages claim.

In sum, the Court finds that summary judgment should be granted on Plaintiffs' nuisance theory. However, the Court denies Defendant's summary judgment as it relates to Plaintiffs' punitive damages claim.

**IT IS THEREFORE ORDERED** that Defendant's motion to sever the plaintiffs for trial (Doc. 35) is hereby DENIED

**IT IS FURTHER ORDERED** that Defendant's motion to strike affidavits submitted by Plaintiffs in support of their response to Defendant's summary judgment motion (Doc. 41) is hereby DENIED AS MOOT.

---

[52]In its briefing, Defendant does not argue that a punitive damages award cannot be based on K.S.A. 65-6203 because it is a statutory cause of action. Therefore, the Court does not address the issue.

[53]*See* K.S.A. 60-3702(c) & (d)(1) (stating that the plaintiff must show by clear and convincing evidence that the defendant acted willfully, wantonly, or maliciously, and, in cases arising out of an employee's conduct, that the employer ratified or authorized the employee's conduct).

**IT IS FURTHER ORDERED** that Defendant's motion for partial summary judgment (Doc. 28) is hereby GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED**.

Dated this 19th day of April, 2011.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE